169 So.2d 50

**Jeff JONES, Sr., and Ethel Jones**

v.

**CONTINENTAL CASUALTY COMPANY OF CHICAGO, ILLINOIS, Halliburton Company, and Meredith S. Hailey.**

No. 47086.

Nov. 9, 1964.

Rehearing Denied Dec. 14, 1964.

McHenry, Snellings, Breard, Sartor & Shafto, Kent Breard, Monroe, for defendants-applicants.

Roy S. Halcomb, Ferriday, for plaintiffs-respondents.

HAMLIN, Justice.

In the exercise of our supervisory jurisdiction (Art. VII, Sec. 11, La.Const. of 1921, LSA) we granted certiorari to the Court of Appeal, Third Circuit, in order that we might review its decision in the present matter, as well as its decisions in three companion cases, all of which were consolidated for the purposes of trial, appeal and review. All actions resulted from one accident; the instant decision will be controlling; separate decrees, however, will be rendered in the three companion cases.[1]

The accident occurred on May 17, 1961, at approximately 12:45 A.M., on U. S. Highway 84, a highway running generally east and west and straight and level at the point of impact. The colliding vehicles were a 1957 4-door Chevrolet being driven by Keith Samuel Jones, who was accompanied by three friends, in an easterly direction at a speed of approximately seventy miles per hour, and a 1957 International bobtail truck, owned by Halliburton Company and insured by Continental Casualty Company of Chicago, Illinois, being driven by Meredith S. Hailey in a westerly direction at a speed of thirty-five miles per hour; when empty the truck weighed approximately 16,000 pounds and at the time of the accident was carrying 18,000 pounds of concrete. The collision was head-on (both vehicles being at a slight angle, as will be hereinafter described), the point of impact being a point in the south, or eastbound, lane of traffic about three or four feet south of the center line of the highway. All occupants of the Jones car were killed.

The plaintiffs herein are the surviving parents of Jerry Jones, a guest passenger of Keith Samuel Jones; the plaintiffs in the three companion suits are the surviving parents of the driver Keith Samuel Jones, and the surviving parents of Eula Mae Dellihoue and Irene Crumb, guest passengers of Keith Samuel Jones. All sued for

1. 159 So.2d 5, 245 La. 732, 160 So.2d 596; 159 So.2d 11, 245 La. 733, 160 So. 2d 596; 159 So.2d 12, 245 La. 733, 160 So.2d 596; 159 So.2d 13, 245 La. 734, 160 So.2d 596.

damages alleged to have resulted from the deaths of their respective children.

The trial court and the court of appeal found that the negligence of both Keith Samuel Jones and Meredith S. Hailey contributed to the accident; both courts found that the guest passengers in the Jones car did not contribute to the accident in any manner and that their parents were entitled to recover damages. Only the defendants-appellants applied to this Court for certiorari.[2]

The principal errors assigned by relators to the Court of Appeal are:

1. The Court erred in fixing a presumption of negligence on defendant, Hailey, and the burden of proof on defendants.

2. The Court erred in holding that Hailey was guilty of negligence because he had sufficient time after discovering the emergency within which to take some action in an effort to avoid the collision, the uncontradicted evidence clearly establishing that Hailey had only 2.5 seconds time after discovering the said emergency.

3. The Court erred in failing to hold that the three guest passengers were guilty of contributory negligence for the reason that they rode in the Jones vehicle while it was being driven by Jones at a reckless rate of speed, weaving erratically from one side of the road to the other, for a distance of over ten miles prior to the accident, such erratic driving being sufficient in itself to notify them of the peril of riding with Jones and thereby rendering each of them guilty of contributory negligence in assuming the risk of riding with Jones operating the vehicle.

4. The Court erred in finding that defendants failed to sustain the burden of proof that the guest passengers in the Jones automobile knew or should have known that Jones was intoxicated.

Respondents contend that Keith Samuel Jones was not negligent, and that the defendants failed to sustain the burden of proof of such contributory negligence. They pray for an increase in the damages awarded and for an award of damages to Samuel Jessie Jones and Willie Mae Cravens, parents of Keith Samuel Jones.[3]

Initially, we shall dispose of the negligence of the driver of the Jones vehicle.

2. In order to protect their entire record and not to have waived any rights whatsoever on the issue of Hailey's negligence, defendants took appeals in all four cases and also applied for certiorari in all four matters.

3. The trial court awarded Jeff Jones, Sr. $7,500.00 plus $300.00 for funeral ex-

The Court of Appeal found that, "* * * the Jones vehicle was being driven at an excessive rate of speed at the time the accident occurred, and immediately prior to that time he was driving in his left, or wrong, lane of traffic. He continued to drive in the wrong lane of traffic for some distance and then he turned back into his right lane which by that time was occupied by the west-bound truck. Also, blood tests taken after the collision revealed that the driver of the Jones car was intoxicated." The Court of Appeal concluded, "Under these facts, we think the driver of the Jones vehicle was negligent in driving at an excessive rate of speed, in driving on the wrong side of the highway, and in attempting to drive while in an intoxicated condition, and that his negligence in these particulars were proximate causes of the accident." The findings of the Court of Appeal are conclusive as to the negligence of Keith Samuel Jones; his surviving parents, Samuel Jessie Jones and Willie Mae Cravens, did not apply for certiorari.

We shall next dispose of the issue of the alleged contributory negligence of plaintiffs' son as well as that of the other two guest passengers. It is alleged that the three were negligent in riding in the car driven by Keith Samuel Jones while it was being driven in a grossly negligent and careless manner at an excessive speed, knowing that the driver had been drinking excessively and knowing that he was then and there and had been for some time under the influence of intoxicating liquor.

■ In order for defendants to prevail in their plea, they must carry the burden of proving all facts necessary to establish contributory negligence unless it be shown by evidence relied upon by plaintiffs. Deshotels v. Southern Farm Bureau Cas. Ins. Co., 245 La. 23, 156 So.2d 465; Smith v. Borchers, 243 La. 746, 146 So.2d 793; Grayson v. Allstate Insurance Company, La. App., 141 So.2d 101; Service Fire Ins. Co. of New York v. Indiana Lumber. M. I. Co., La.App., 111 So.2d 358; Dilworth v. Roberts, La.App., 138 So.2d 453.

■ A blood test made after the accident occurred revealed that Keith Samuel Jones' body contained 0.11% alcohol content. Dr. Herman Gibson, Jr., Coroner for the Parish of Concordia, testified that this content was prima facie evidence of blood alcoholic intoxication. Our Jurisprudence affirms the findings of the trial court and the Court of Appeal that the alcoholic content of the driver's blood was sufficient

penses, and awarded Ethel Jones $7,500.-00, which judgment was affirmed by the Court of Appeal. The same amounts were awarded to Alf Crumb and Viney Crumb. Grant Dellihoue was awarded

$15,000.00 plus $300.00 by the trial court, but the Court of Appeal reduced the award by $7,500.00 since he was the only surviving parent of Eula Mae Dellihoue.

to establish that he was intoxicated and that his mental and physical faculties were materially impaired at the time the collision occurred. .

"The same reasoning is applicable here. Under our more recent jurisprudence as set forth in the cited cases, it is no longer necessary to show that the driver was drunk. The fact that he had a sufficient quantity of intoxicants to make him lose normal control of his mental and physical faculties and cause such faculties to be materially impaired is sufficient. We therefore hold that the action of a guest passenger in voluntarily riding with a driver under the influence of intoxicants ,to an extent sufficient to make him lose normal control of his mental and physical faculties and to cause such faculties to be materially impaired, whose condition was known or should have been known to the guest passenger, constitutes not only an assumption of the risk in any claim against his host but also independent, contributory negligence sufficient to bar his recovery from third persons in any case where the host driver was guilty of negligence which was a proximate cause of the accident." Otis v. New Orleans Public Service, Inc., La.App., 127 So.2d 197. See, Grayson v. Allstate Insurance Company, La.App., 141 So.2d 101

Evidence of record shows that the guest passengers were not with Keith Samuel Jones during the entire evening prior to the fatal accident; all had social engagements which separated the group; some attended a. graduation at the Jonesville High School. Plaintiffs' son, Jerry Jones, did not attend the graduation; he and other companions were with Keith Samuel Jones during the early part of the evening. The evidence of record discloses that Jerry Jones was with the driver for longer intervals than the other two passengers. At approximately midnight the three guest passengers and Keith Samuel Jones met and thereafter departed from Jonesville for the drive to Ferriday; there is no evidence that the departure was hurried.

The Court of Appeal gave weight to the testimony of Joe Dan Barber and Charlie Swift, who stated that they had been with Keith Samuel Jones for several hours of the evening before the accident and neither saw him nor any of the occupants of the car drink any alcoholic beverages.

Despite the testimony of Barber and Swift, we believe that having found as a fact that Keith Samuel Jones was intoxicated at the time of the accident, it is unreasonable to say that his guests did not realize that he was intoxicated. If they did not realize his condition, they should have; such is the test of the law.

"The courts have repeatedly recognized that in order to prove that one is incapable of operating a motor vehicle, it need not be shown that he was drunk, but only that he had a sufficient quantity of intoxicants to make him lose normal control of his mental and physical faculties and cause such faculties to be materially impaired; and that whenever a guest companion who knew or should have known that the driver was under the influence of drink, voluntarily rode with him in such condition, the right of the guest to claim damages is barred. * * *" Dowden v. Bankers Fire & Marine Insurance Company, La.App., 124 So.2d 254. See, Grayson v. Allstate Insurance Company, La.App., 141 So.2d 101; Otis v. New Orleans Public Service, Inc., La. App., 127 So.2d 197; Cormier v. Angelle, La.App., 119 So.2d 876; Ford v. New Orleans Public Service, Inc., La. App., 102 So.2d 523; Elba v. Thomas, La.App., 59 So.2d 732. Cf. Addington v. American Insurance Co. of Newark, N. J., La.App., 162 So.2d 190.

Garth Randall, who was driving on Highway 84 at the time of the accident, testified that the Jones vehicle passed his car at a distance of approximately one-half mile west of the scene of the accident; that the Jones car was being driven at an estimated speed of seventy miles per hour, and that as far as he could see it continued on the wrong side of the highway after passing.

Alton Carlock (the trial court gave little credence to his testimony) testified that shortly after midnight on May 17, 1961, he was driving home from his work for the purpose of picking up equipment connected with his employment as an oil field pumper; that he entered Highway 84 from a side road several miles west of the scene of the accident and saw the Jones vehicle parked. He said that the passengers and the driver were engaged in what appeared to be a drinking party, but when pressed he stated he did not know what they were drinking; that they were hollering and carrying on. Carlock further stated that he proceeded towards Ferriday; that the Chevrolet, being driven at a terrific speed, passed him and he had to drive off of the road in order to avoid being hit. After the "whole bunch" hollered to get out of the way, followed by an insulting remark, Carlock began a ninety mile per hour chase of the Chevrolet to ascertain its license number. Finding that he could not overtake the car, Carlock stated that he was nervous and stopped on the side of the road and sat on the hood of his car for fifteen or twenty minutes, arriving at the scene of the accident some time later. He saw neither the truck nor any observers or helpers; he only observed the wrecked Chevrolet, which he positively identified as the car he had previously seen and chased on the highway.

The defendant Hailey places helpers at the scene of the accident at the time Carlock states that it was deserted. Hailey testified that a doctor and an ambulance were at the scene of the accident while he and Mr. Randall went to Ferriday to communicate with the police and Hailey's employer.

█ Under the above facts and circumstances, we believe that the defendants have borne their burden of proving the contributory negligence of plaintiffs' son and the other two guest passengers. If these parties did not know, they should have known that the driver was intoxicated. All four occupants of the car are deceased and cannot testify, but we find that the record contains sufficient evidence to support our finding. We conclude therefore that Keith Samuel Jones' guest passengers were guilty of contributory negligence and that no recovery for their deaths can be had from the defendants herein.

In answer, the defendants explicitly set forth their version of the events which transpired immediately before the accident as follows:

"Meredith S. Hailey * * * was driving in his proper lane of traffic at a lawful and safe rate of speed in a careful and prudent manner, keeping a good and proper lookout ahead; that it was a dark night and Hailey had turned on the truck's headlights, tail lights and running lights, all of which

were burning properly; that at a point about five and one-half miles west of the Town of Ferriday, Louisiana, U.S. Highway 84 is straight for a distance, said highway running in an easterly and westerly direction at said point; that while driving as aforesaid and after having proceeded into the straight portion of said highway described above, Hailey saw a car down the road to the westward, which he later learned was a 1957 4-door Chevrolet automobile being operated by Keith Samuel Jones and which car was travelling in an easterly direction at a terrific rate of speed in excess of eighty-five miles per hour and which car was travelling over across the center line of the highway in the north lane of said highway, which traffic lane is dedicated to vehicular travel moving to the westward, and in which northerly lane Hailey was then and there travelling in a westerly direction; that Hailey immediately reduced the speed of his truck and momentarily expected and anticipated that the driver of the oncoming vehicle would promptly return to his proper side of the highway and cease to travel in his wrong traffic lane; that instead of returning to its proper traffic lane, the oncoming vehicle came further over into the said north lane of traffic on a course that made a head-on collision between said vehicle and the truck be-

ing operated by Hailey certain and imminent; that the presence of the car travelling at such a high rate of speed on the wrong side of the road in the north traffic lane in which Hailey was proceeding westwardly presented to Hailey an immediate and *imminent emergency* created solely by the negligence of the driver of said car; that acting under *said emergency conditions* then and there existing, Hailey elected to take the only escape route then and there available to him and Hailey turned his truck to his left in an effort to avoid the head-on collision with said car; that just as Hailey turned his truck to his left, almost instantaneously the driver of the car turned his car back to his right and thereafter crashed into the truck being operated by Hailey; that the accident happened and the situation developed with such rapidity and under such unforeseen and unforeseeable circumstances that there was nothing that Hailey could do to prevent the collision which was caused by no fault or negligence of whatsoever nature on the part of said Hailey." (Emphasis ours.)

The following excerpts from the testimony of the defendant Hailey affirm the above contentions of defendants:

"Q. When did you first notice the 1957 Chevrolet that was traveling east of US Highway-84, involved in this accident?

"A. I was 1000 feet away from, he was in the curve.

"Q. He was in the curve?

"A. West of where the impact was at.

"Q. When did you realize that there might have been something wrong, with reference to the Chevrolet?

"A. Whenever he got out of the curve, I'd say 100 feet, he was on the wrong side of the road in my lane of traffic.

"Q. Could you tell, prior to him leaving the curve, whether he was in your lane or in his proper lane of traffic?

&ast; &ast; &ast; &ast; &ast; &ast;

"A. No sir, I couldn't tell, when he was in the curve, whether he was in my lane of traffic or the other lane of traffic.

&ast; &ast; &ast; &ast; &ast; &ast;

"Q. But when he came out of the curve and was out of the curve about 100 feet, you could tell he was in your lane of traffic?

"A. That's right.

"Q. About how far were you from him, if you can tell us, when you realized when he was out of the curve and in your lane of traffic?

&ast; &ast; &ast; &ast; &ast; &ast;

"A. About 600 feet, more or less.

\* \* \* \* \* \*

"Q. When you saw that vehicle coming towards you under those circumstances, what did you do then and there?

"A. I gradually pulled to my left.

"Q. Did you reduce your speed?

"A. Sure, I let off on my gas.

"Q. Then, when you first saw him come out of the curve and realized he was in your lane of traffic, did you first take your foot off the accelerator?

"A. Yes sir.

"Q. What did the Chevrolet do then and there?

"A. He kept coming a little more in my lane of traffic.

"Q. Did he move over further to your right, into your lane of traffic?

"A. Yes sir.

"Q. What did you then do, as he moved over further into your lane of traffic?

"A. I turned to my left.

"Q. Was that particularly \* \* \* did you make up your mind promptly that that's what you were going to do?

"A. Yes.

"Q. Why did you turn to the left, Mr. Hailey?

"A. Well, I had no choice hardly; if I had stopped or throwed on my brakes, he would have hit me straight full in the face, and if I had cut to the right on the shoulder, he would have probably hit me in the side, or I would have lost control of my truck.

"Q. Then, when you saw him coming towards you at this high rate of speed, did you feel that you had to take immediate and prompt action to avoid a collision?

"A. Yes sir.

"Q. Were you in what we call an emergency situation there?

"A. Yes sir, I sure was.

\* \* \* \* \* \*

"Q. What was your plan of action by turning to the left, what did you plan to do?

"A. I was going to try to get around him.

\* \* \* \* \* \*

"Q. And how did you have it figured that he was going to take what course of action?

"A. Well, he was still in more my lane of traffic and kind of \* \* \* well, he was further in my lane of traffic, and that looked

like the only chance I had to go, was to the left.

\*   \*   \*   \*   \*   \*

"Q. From the position that you were in and from the motions that he was making further into your lane of traffic, did you think that cutting to the left was the only out that you had?

"A. Yes sir.

\*   \*   \*   \*   \*   \*

"Q. Did you apply your brakes?

"A. No sir, because if I had, I would have been a setting duck.

\*   \*   \*   \*   \*   \*

"Q. Did you feel that if you had applied your brakes, that it would have been unquestionably a head-on collision with the Chevrolet in your lane of traffic?

"A. Yes sir.

"Q. What if you had cut to your right, Mr. Hailey, and gone onto the shoulder?

"A. Well, my truck is about 30 to 35 feet long, and if I had cut to my right, I figure he would have hit me in the side, or I would have lost control of my truck on the shoulder of the road.

"Q. What was the only reason that you made any movement to the left, out of your proper lane of traffic, across the center lane, why did you do that?

"A. That's the only way I figured I could miss the car, the only exit I had out.

"Q. You were confronted with an emergency made by the Chevrolet in your lane of traffic?

"A. Yes sir.

"Q. And that's why you turned to the left?

"A. Yes sir.

\*   \*   \*   \*   \*   \*

"Q. Now, Mr. Hailey, when you turned to your left to avoid this head-on collision, did you have any possible way of knowing that the Chevrolet driver was going to cut back to his proper lane of traffic?

"A. No sir.

"Q. Did you anticipate that he might have?

"A. No sir.

"Q. Was there any way for you to do that?

"A. No sir.

"Q. Did this whole thing happen quickly?

"A. In just a split second.

\*   \*   \*   \*   \*   \*

"Q. After you were committed and were moving into his lane of traf-

fic to avoid him, and after he cut back to his right at an angle towards you, was there anything at that point that you have have done to [have] avoided this accident?

"A. You mean whenever he cut back to his right?

"Q. Yes sir. * * *

"A. No sir.

"Q. If you had put on your brakes, would it have made any difference?

"A. No.

"Q. Could you have regained your side of the road and avoided the accident?

"A. No sir.

"Q. At his speed and your speed, after that there was no way to prevent the accident?

"A. No sir.

* * * * * *

Cross-Examination:

"Q. Mr. Hailey, the general condition of the road there where this impact occurred, were the shoulders wide enough to have accomodated your vehicle there?

"A. I could have got off on it I imagine, but if I had I would have lost control of my truck.

"Q. On what do you base that conclusion? Now, of course, that's just merely your opinion and I really shouldn't question you on it; but why do you say you would have lost control of your truck?

"A. The truck was pretty heavy.

* * *

"Mr. Halcomb: True enough.

"A. * * * and if it would have hit that soft ground or gravel, I'm pretty sure I would have lost control of it.

"Q. And all of this went through your mind: 'If I pull over there on the righthand side, now I'm going to lose control of this truck'; all of that went through your mind?

"A. Well, how long does it take you to make up a question to ask me? You can think of a lot of things in a split second when you're in an emergency."

The hereinabove portion of defendants' answer and the testimony of defendant Hailey set forth in substance defendants' contentions that defendant Hailey acted in a sudden emergency and should not be held to have acted negligently under the conditions which prevailed at the time of the accident.

■ In view of the fact that a part of the defendants' truck was in the wrong lane

of traffic at the time of impact, at an angle, the onus of proof is upon defendants; they must show that the collision was not caused by Hailey's negligence, or that there were justifiable circumstances which would excuse his conduct. Bryant v. Johnson, La. App., 140 So.2d 758; Noland v. Liberty Mutual Insurance Company, 232 La. 569, 94 So.2d 671; Duhon v. Harkins, La.App., 152 So.2d 85; Breaux v. Valin, La.App., 138 So.2d 405; Rizley v. Cutrer, 232 La. 655, 95 So.2d 139.

Under the facts of the instant accident, we find that Hailey's error of judgment was in cutting to his left. His testimony affirmatively discloses that his intention was to avoid an accident, which was and he thought was imminent; he hoped that his maneuver would assure his negotiation of the impending traffic peril. For our determination is the question of whether Hailey can be absolved from negligence under the facts of the emergency in which he committed an error of judgment.

"The law does not require a choice unerring in the light of after events; it requires such a choice as, under all the known or obvious circumstances, a reasonably prudent man might make. A person is by no means held to the same judgment and activity under all circumstances. The opportunity to think and act must be taken into consideration in determining whether due care was exercised in making a choice between methods or courses of conduct. As hereinafter appears, the fact that one acts in the stress of an emergency or sudden peril not due to his own act or omission justifies conduct that would otherwise be regarded as negligent. 38 Am.Juris., sec. 193, verbo 'Negligence'.

"The circumstances under which a person is required to choose between methods are material in determining whether he was negligent in his choice. Usually the safest course to take when one is handling a vehicle in traffic is to stop when danger presents itself, but there is no requirement of law which will render one negligent if he fails to stop, where, in a sudden emergency, another course of conduct is consistent with ordinary prudence. The law does not expect one to exercise the same degree of judgment in an emergency wherein his personal safety is threatened, as in a situation where he is not subject to the fear of sudden disaster. The law recognizes the fact that a prudent man, when brought face to face with an unexpected danger, may fail to use the best judgment, may omit some precaution he might have taken, and may not choose the best available method of meeting the dangers of the situation. It does not charge him with contributory negligence for the fact alone that he makes a mistake in the method adopted to escape a peril which

exists not through his fault, but through the negligence of another. 38 Am. Juris., sec. 194, verbo 'Negligence'." Snodgrass v. Centanni, 229 La. 915, 87 So.2d 127. See, Thibodeaux v. Gore, La.App. 124 So.2d 336; Breaux v. Valin, La.App., 138 So.2d 405; Higginbotham v. Frazier, La.App., 92 So.2d 89; Commercial Standard Insurance Company v. Johnson, 228 La. 273, 82 So.2d 8. Cf. Martin v. Firemen's Insurance Co. of Newark, N. J., 241 La. 1047, 132 So.2d 892.

The Court of Appeal found that "Hailey undoubtedly was confronted with somewhat of an emergency when he observed the Jones car approaching him in the truck's lane of traffic at a distance of 600 feet. Instead of attempting to avoid a collision by stopping or turning sharply to his right or left, however, he merely let up on the accelerator and angled his truck slightly to the left straddling the center line, and he then continued to travel almost along the center of the highway, at least partially in Jones' lane of traffic, for a much greater distance than would have been required for him to stop. According to the traffic expert called by defendants, a period of between 2.3 and 3.9 seconds elapsed between the time the truck first crossed the center line and the time of the accident." The Court stated that in its opinion Hailey had sufficient time after discovering the emergency within which to take some action in an effort to avoid a collision.

Dr. Herman Gibson, Jr., Coroner for the Parish of Concordia, arrived at the scene shortly after the accident occurred for the purpose of viewing the bodies and the wreckage. He stated that the accident was one of high impact of speed with a lot of foot-pound energy being expended. It was his opinion that the driver of the Chevrolet was intoxicated and was going at a high rate of speed on the wrong side of the road; that the Chevrolet angled from the north shoulder of the road diagonally across the highway to the point of impact, striking the Halliburton truck at an angle. Dr. Gibson testified that it is very hard to say what a man will do when he is faced with a situation in an accident.

Marion E. Barnett, State Trooper, Louisiana State Police, testified that he investigated the accident after having been notified of it by Garth Randall. On direct examination, he was asked whether he felt that the method in which Hailey tried to avoid the head-on collision under the then existing circumstances, as he knew from his testimony and from the physical evidence, was prudent under the then existing circumstances. He replied that he thought it was; he also said, "I feel like I'd have probably done the same thing, right or wrong." On cross examination, Trooper Barnett stated that if he saw a vehicle coming towards him in his lane of traffic 600 feet away, he would attempt to stop or apply his brakes. On redirect examination, when questioned about his answer on

cross examination, he said that the day after the accident Hailey told him that the two vehicles were 75 feet apart when he Hailey determined that they were going to hit.

William H. Tonn, Jr., a consulting engineer whose work is limited to problems relating to fires, explosions and collisions, when asked what in his opinion was the proximate cause of the accident, stated, "My opinion as to the proximate cause of this accident was due to the Chevrolet driving on the wrong side of the road at a high rate of speed." On cross examination, he gave the following pertinent testimony:

"Q. You've testified, Mr. Tonn, in answer to a hypothetical question that it was your opinion that the driver of the Chevrolet, or the action taken by the Chevrolet was the proximate cause of the accident; is that true?

"A. Proximate, (spelled) p-r-o-x-i-m-a-t-e-. Not approximate, but proximate.

"Q. Proximate. What is your appreciation of that particular term?

"A. My appreciation; you mean what is my definition of it?

"Mr. Halcomb: Yes.

"A. My definition of proximate is that if you want to pinpoint one factor that you can say, 'That was what

initiated the collision, that's what started it, that's what started all of the sequence of events that ended up in the collision.' That's what I mean by proximate."

A study of the contentions of relators, the testimony of record, and the evidence of record, constrains us to conclude that defendant Hailey was confronted with a sudden emergency; we find that he did not contribute to the imminent peril with which he was faced when he swerved to his left. Peeples v. Dobson, 99 So.2d 161; Duhon v. Harkins, 152 So.2d 85. As stated previously, Hailey's vehicle was 30 to 35 feet long, with a total weight of 34,000 pounds; he was travelling on a 24 foot wide highway with a 1 and ½ foot to 2 and ½ foot slope to an approximate 12 foot gravel shoulder. Hailey's uncontradicted testimony convinces us that he was a prudent experienced driver who was brought face to face with danger. Under the facts, he did not make the best judgment; we conclude, however, that he is not guilty of negligence for the fact alone that he made a mistake in the method adopted to escape a peril which existed not through his fault but through the negligence of another.

For the reasons assigned, the judgment of the Court of Appeal, Third Circuit, is reversed and set aside; the suit of plaintiffs is dismissed at their costs.